Good afternoon to you, Your Honor, and may it please the Court, Robert Sheldon for the defendants. If possible, I'd prefer to reserve five minutes for my rebuttal. Can you speak up a little bit? Sure. More? Okay. If possible, I'd like to reserve five minutes for my rebuttal. And I have a few preliminary observations which may be of assistance, and of course I'd be delighted to answer any questions that the Court has. If absolute immunity is not observed, either because of a request for deference or because instrumentalities are not eligible, or there would be the commercial activity exception, and for all we know, other exceptions. That's number one. Number two, with respect to the subject of whether instrumentalities are potentially immune, I would urge the Court's attention to the legislative history which is before the Court, including the letter from Secretary of State Rogers and that instrumentalities had always been entitled to the same immunity as governments. Number three, with respect to the subject of deference, I would urge that the deference that should be shown is to the two generations of trial lawyers who will have to try this case for the government, both of whom conceded, in effect, that my clients were instrumentalities because they know what they will have to prove under the Economic Espionage Act, or at least try. And I would say with further respect to the subject of deference, there is a study that the Court may be familiar with. It is cited at note 18 of the Samantar decision. It's a study by and for the State Department shortly after the passage of the Foreign Sovereign Immunities Act, in which the State Department's lawyers surveyed all of the cases between 1952, which was the adoption, as you know, of the Tate Letter, and 1976, which as you know was the adoption of the Foreign Sovereign Immunity Act. And the purpose was to, in effect, create a history of what had happened with respect to immunity requests to the State Department. There are several notable things about that, and I'm a trial lawyer, not an appellate lawyer, and I regard that study as, in effect, the evidence of what the state of immunity requests with respect to the State Department were. I would say this. Can I ask you, is there a relevant period of time where you think the decisional law is most relevant to what we're doing here? Because we have essentially 100 or 200 years, depending on how you count it, of law or the absence of law. And within that, there's been some developments over time. You mentioned the Tate Letter, the FSIA is another. Are you asking us to focus on any particular period of time as the most relevant here? We haven't previously asked you to do that, and if I may, if I'm allowed to say this, that's a good question. And I would say that the period of time that is of most relevance is 1952 to 1976, and then the period subsequent to 1976. Okay, why do you say that? Because, I'll tell you why, because in the, I believe, in Justice Gorsuch's opinion in the Hulk Bank case, he said that the deference doctrine, if you will, began to develop in the 20th century. And I think it's worth looking at that, in particular, after the Tate Letter, to see what actually was going on. Can I ask you about, I mean, one of the things you've pointed to, and it makes some sense, is to look at the second restatement. Because that's done in the late 60s, right before the codification of some of the common law, and the modification of some of it in the Foreign Sovereign Immunities Act of 1976. Yes. And in addressing the question of what entities qualify at the threshold for getting any form of foreign sovereign immunity, they refer to a corporation created under its laws and exercising functions comparable to those of an agency of the state. How is it that your clients exercise functions comparable to an agency of the state? They look like corporations that do commercial business. Yes, I must say that I had the same question when I read that language. And the answer is in the cases that were decided both before and after the adoption of the FSIA. Well, the FSIA clearly adopts a broader definition of what corporations qualify for some form of immunity, because it clearly extends beyond those exercising functions comparable to an agency. You could have an ordinary corporation, and if it's directly owned by the government as a majority of its shares, it counts for the FSIA, but that does not appear to be true under this, at least the ALI's description of the common law in the restatement in the 60s. So the first case that I would point your honor to would be the World's Arrangement case, in which it was a district court opinion in which the company was one-third owned by the British government, and the court said served the purpose of ensuring an adequate oil supply for the British Navy. They put a lot of weight on the fact Britain's an island nation, its Navy was the centerpiece of its empire, and that having an adequate supply of maritime fuel was essential to its national security. But they distinguished the Deutsches case involving a French corporation, saying that the French government was involved in a commercial venture entirely divorced from any governmental function, and that's from the World Arrangements case. So why aren't you on the wrong side of the World Arrangements line? Because if you look at the cases that have addressed that subject under the Foreign Sovereign Immunity Act, which is widely regarded as having codified the common law, you will see what kinds of purposes, which is the test, one of the tests. No, well, two things. First, the Foreign Sovereign Immunities Act, with respect to what entities, qualify for sovereign immunity, does not codify the common law, at least as stated in the restatement. It changes it. It expands it. But second, it also rejects a purpose test and looks at the outward form of the activities, not for purposes of determining what the instrumentality was. Well, if I may, since you're arguing in re-World Arrangements, what about this case do you contend brings it factually within the in re-World Arrangements world? The first thing is a comparison of the purpose recited in the in re-Worlds case. And the second thing is the degree of control and lack of separation that the record establishes in this case and by comparison to the World's Arrangement case. So, but what is it about China's priorities or goals that are essential to its existence that you are carrying out on its behalf? Your client, sorry. That is set forth, Your Honor, in the very first paragraph of the indictment and in the Sumoji Declaration, which makes clear that the development of this process was a national priority of the People's Republic of China. Right, but what suggests that Peng Yang Group was charged with carrying out that or fulfilling that national priority?  What suggests that your client was charged by China to carry out or fulfill that priority? That's what's alleged, I think, in the first paragraph of the indictment and is set forth in detail in the Sumoji Declaration. If I, let me just ask who? I'm asking you factually. Can you just tell me? What is it that my clients allegedly did in that connection? What factually shows that they were charged with fulfilling this national priority of China? Thank you. The Sumoji Declaration sets that forth in great detail and I'm happy to recite what he says. He said that the state has controls, owns and controls the companies, that it had a five-year plan that was proposed by the Communist Party, drafted by the State Council and approved by the People's Congress, that it gave both strategic and detailed guidance, and that it was charged with, that is to say, SESAC was charged with making sure that the Peng Yang companies achieved the PRC and the Communist Party's priority of improving the TIO2 production capabilities. I just want to understand the test that you think should apply here. Are you arguing that all foreign state-owned entities should have absolute immunity or are you conceding that some do not and we need to do an analysis as to which should have it and which should not? No, I think all should. So it doesn't matter what they're doing? Well, no, of course, I'm sorry, you said owned. Of course, it definitely depends on what they're doing, absolutely. There's a four-part test and it has to do with what purpose they serve, what the degree of separation there is, how controlled they are and to some extent ownership. So that is a four-part test set forth in a number of cases and if you take that four-part test and particularly if you look at the purpose aspect of it, you'll see that our clients fall exactly within the kinds of foreign instrumentalities that should be entitled to immunity, other things. How different is this test from the test that applies under the FSIA in the civil context? It's very similar. It's very similar and I respect what Your Honor said, but I believe that the, I'll say this. First. Well, what you said in your brief is that this test from the common law is similar to the Oregon standard. Yes. It's the other part of the FSIA that extends beyond Oregon and reaches corporations that just happen to be majority owned that seems like an innovation on the common law. That's exactly right. Okay. That's exactly right. That's 100% correct. I agree completely. And if you look at the purposes that have been found to be meaningful to courts, in the Gates case decided by this court, it was to advance Alberta's interest in the marketing of hogs. In the EIE Guam case, it was to revitalize Japan's financial system. In the Power X case, although there was, quote, nothing inherently public about the defendant's activities, it was serving the government's purpose of creation of jobs and economic development. Here in this case, based on the indictment in the very first paragraph and the very detailed Sumoji declaration, the purpose of improving TIO2 production fits precisely within those. Okay. And as to the issue of whether the government gets any deference in its conclusion, its argument here that your clients don't have immunity, your answer is? Well, there are a number of levels. The first question would be, what are they seeking deference with respect to? That is to say, with respect to what subjects? Or are they simply claiming a vote? That is to say, do they say that they're entitled to deference about, for example, whether our clients are instrumentalities? Because if that's what they're seeking, their trial lawyers have twice confessed that, so to speak. And I would say those people should get deference. That's number one. Number two. What do you say to this line of authority, Hoffman, other statements in the Supreme Court case law about the importance of deference and the reason why we give it, right? I'm very happy to address that with the 35 seconds that I have left. But I'm very happy to address that. Those cases said that there were two reasons for that deference. One was that courts should not deny immunity where the government had recommended it, so as to not embarrass the executive. That's obviously not a factor here. The second is. And you say that because you don't treat this lawsuit as an effective recommendation? No, it was not to deny immunity where the government had recommended it. Okay. It's a very important distinction. Here the government is not recommending immunity. So that rationale for deference doesn't exist. And the second reason that those courts offered was not to create new immunity where the government, the executive had not proposed it. And that's certainly not happening here either. And the reason that I. . . was shown in the earlier days, including in particular from 1952 to 1976. And I urge you to consider the following. What was happening from 1952 to 1976 was a two-part system. A defendant could either go to court and get an immunity decision or could go to the State Department where there was a. . . could go to the State Department and they had informal conferences before State Department lawyers. I don't mean to be facetious, but this was not Dean Rusk or Dean Acheson sitting there and making complicated political decisions. As the sources that I've just cited state, what happened was the very same parties who were in court submitted pleadings and memos to the State Department's lawyers who, looking at those facts, came up with their conclusions. That was not the sensitive kinds of things that one would think ordinarily would get deference. And I suspect that were this court to be asked to defer to unknown State Department lawyers about something, you would not be so inclined. So I would urge you to look at those two sources, the study in Note 18 of Samantar and the Lowenfeld article, which is an exhibit to the Packard Declaration below, to see what their regime actually was like. All right. We've taken you over your time. And I actually have one more question I want to ask before you sit down, but we'll give you time for rebuttal, Chris. I hope I'm being helpful because. . . Before you sit down. Yes. And that relates to if immunity is triggered and we were to reach the question of whether there would be, under the common law, a commercial activities exception, you've argued that under Broidy this would be considered noncommercial. But on page 595 of Broidy, the court distinguishes between stealing the trade secrets of a commercial rival and deploying them against that rival from the kind of intelligence activities at issue in that case. Yes. Why aren't you on the other side of that line here? That's a difficult question for us. And I acknowledge that. I would acknowledge that with respect to much of the indictment, it's a difficult argument for us. It's not so hard with respect to the hacking allegation at paragraph 22. And there are several reasons for that. Number one, if you look for purposes of the commercial activity exception, Your Honor, you do not look to the purpose. You look to the nature of the activity by statute. And if the common law were to follow the FSIA. . . But the indictment specifically alleges in paragraph 30 that they made commercial use of the trade secrets stolen from DuPont. I don't believe that paragraph 30. . . It says, Seh Chow prepared a report for Panggang Group Titanium. . . Yes. . . with specific suggestions for improving USAPTI's designs. Yes. Seh Chow's suggestions relied in part on DuPont's trade secrets, which he included in his report. Yes. Number one, that has nothing to do with hacking, number one. Number two, as Your Honor, if you look at paragraph 30, that activity was alleged to take place in China. The Seh Chow's activity was alleged to take place in China. And if you look at the restatement, section 69. . . Sorry. No, but I don't see why that's irrelevant. Because Broidy says that under Weltover, you're not precluding from consideration of the context of a sovereign's actions. And what a foreign sovereign does with covertly obtained intelligence is certainly an aspect of the outward form of the conduct that the foreign state performs. So stealing DuPont's trade secrets and then putting them to commercial use, which is what that alleges, seems commercial under Broidy. I understand what Your Honor is saying. But with respect to that allegation in particular, it specifically says that that activity took place in China. And under the restatement, section 69, once we establish that there is an instrumentality, the government has the burden in the cases that Your Honor has decided with Pan Gang and the cases that Pan Gang cites. The government has the burden of coming forward with evidence that that activity did not take place in China. That's restatement section 69. And it specifically says in that paragraph that it took place in China. That is true with respect to paragraph 30. And it is particularly true with respect to count two of the indictment. Count two of the indictment is the attempt count. Count two incorporates by reference only paragraphs one through 15. And there is nothing in those paragraphs that would satisfy either the basis or the basic commercial exception or the location of that activity as required by restatement section 69. So count two unquestionably, irrespective of the excellent questions Your Honor has put to me, count two does not survive. And I would submit that paragraph 30 does not fully assist the government because it's alleged to have taken place in China. Okay. All right. Thank you, Counsel. Thank you. We'll hear now from Mr. Yelovich. Good afternoon, and may it please the Court. Matthew Yelovich on behalf of the United States. I'm happy to answer any questions the Court has or else I'll just jump in on the conversation that the Court was having with my friend. I heard my friend talk about Republic of Mexico v. Hoffman, the two instances in which the Supreme Court in that case articulated why deference would be important for the executive. One of those two instances is recognizing immunity where the executive has determined that no immunity should be given, and that's precisely the situation we are in here. The executive by instituting this prosecution has deemed that immunity is not merited to these defendants, and that is directly on point with the concerns articulated in Hoffman as to the conduct of our nation's foreign affairs and why deference would be important. Are you arguing for absolute deference, or are you arguing that deference is some kind of significant factor or some plus factor? We don't think that the Court has to decide that precise question in this case, Your Honor, and I can explain a little bit why. We do think that the Supreme Court has suggested in Hoffman itself that it would essentially be dispositive, the deference given to the executive, and it would be particularly dispositive... I wanted just to weigh in on that a bit because here we have the Department of Justice attorneys that have filed this lawsuit. Wouldn't we give more deference had it been the State Department? I mean, if the State Department wrote a letter and said, you know, there is no immunity for Pangan Group and the Department of Justice can proceed with its lawsuit, wouldn't that be a stronger statement of the political calculation that's going on here? I appreciate the Court's question, and I apologize I didn't see you waving for time.  I think our answer is no. I stand here today on behalf of the executive branch, not on behalf of the Department of Justice and all of the executive's components, and this case was instituted by the executive branch. If the State Department were to speak in this case, it would be through the Department of Justice's lawyers, and, you know, we've given it considered judgment before bringing this case. Does the U.S. Attorney's Manual contain any requirement about a level of approval for the indictment of an entity that's owned by a foreign sovereign? So I'm happy to speak to that question, Your Honor. I want to be careful not to talk about particular consultations that happened in this case. The U.S. Attorney's Manual is a public document. It does have lots of things. You have to go back to Maine Justice for this, and it sets those out publicly. You're absolutely right. Does it have the provision that says that if you're going to indict a foreign sovereign or what would be a foreign sovereign if the FSIA applied, which we know now it doesn't, that you have to go back to Maine Justice in D.C. and get approval at a certain level? It does not have that provision, Your Honor. I would point the court to the provision in the Justice Manual that requires U.S. Attorney's offices, all 93 U.S. Attorney's offices, to file what are called urgent reports for any development in a significant case that's likely to generate attention, either congressional or public, or a significant development that the U.S. Attorney considers in a significant case. And those urgent reports go to top leadership in the department, and so I think that in a case like Your Honor is positing where the court is concerned about the potential foreign policy implications of a charging decision, the urgent reports provide some backstop. I think Judge Wardlow's point is that it's one thing to give deference when we have a formal representation at a high level of the government. It's another thing where we don't have anything indicating more than the approval of a U.S. Attorney. And there are some things like, you know, the state secrets doctrine has to be invoked by a cabinet-level officer in order to be effective. So there's some judicial doctrines where we require if you want to have a certain level of deference, it has to be at a certain level of responsibility. I appreciate that point, Your Honor. I would make two points in response. The first is the actual charges in this case under the Economic Espionage Act require consultation with the National Security Division in Washington, D.C. And what consultations happen between the components of the executive after that consultation requirement is satisfied are obviously a case-by-case and aren't required in the justice manual, but that is one point I would make. The second is that I don't think in the 200-year history of deferring to the executive on these immunity decisions the courts have demanded in the common law context a certain level of cabinet officer be personally weighing in with the judgment on behalf of the executive. As I said, I stand here today on behalf of the executive branch in articulating our position that immunity is not appropriate for these defendants, that they have violated allegedly the criminal laws of the United States and that the prosecution should be permitted to go forward. What about if it was an actual state? What if you had come in and said we're suing an actual foreign country? Do you get deference for that? So what the Deputy Solicitor General articulated in the Hawk Bank oral argument is our position on that question, which is that the government would not do that, bring a suit against a state qua state. And there are many, many reasons, as articulated in the government's brief, as to why these defendants are not the state qua state but are separate corporate persons that are treated as such under the law going back to the founding. I'm trying to get at what are the limits on the deference request because Hoffman wasn't a criminal case, and one thing Justice Gorsuch flagged was there may be some different considerations in a criminal case. Yes, Your Honor. I think that whether the deference that's given here is binding or just significant weight, as the Fourth Circuit articulated, I think the result is the same given the history of how the common law has treated separate corporate entities, again going back to the founding, the history of the executive having the prerogative of bringing prosecutions against foreign officials, again dating back to the founding, two cases from 1794 cited in the government's brief where the foreign official invoked these same claims, that they were being indicted as the state qua state, and the courts had no problem saying that when the executive instituted those prosecutions, that claim is no longer valid for those defendants. This, as to the precise question that the court asked, the limits of the deference, I think that although unlikely, one could envision a hypothetical where the executive came in and asked for deference in a matter that was so clearly inconsistent with the executive's constitutional role for where the court might second guess that deference. Obviously, that's not the case here. There's simply no record to support that kind of allegation, and I don't take my friends to be making it, but it would be unprecedented to just completely disregard the executive's discretion here in terms of granting immunity or denying immunity. Can I ask you about the underlying substantive standard? Do you disagree with the defendant's argument that the restatement test that I quoted earlier from Section 66G is a fair statement of the state of the common law at the time of the Foreign Sovereign Immunities Act enactment? We do think that sovereign versus non-sovereign functions is the test as to whether an entity merits immunity. So we agree that the functions comparable to an agency of the state would be the analysis as to whether immunity would be granted in the ordinary course. Do you see that test as being different from the organ component of the FSIA's definition of foreign state, or do you see that one as being different? The organ component of the FSIA abrogated the common law when it came to defining the foreign state broadly. Because it clearly covers more corporations. But he's made a sub-argument that the organ part of the definition is actually sort of the restatement 66G version, and other parts in addition. It's an innovation which Congress is entitled to do on the common law. But that would have significance because it would mean we'd look to the organ case law under the FSIA as relevant to the state of the common law. So that's why I wanted to ask you what your view is specifically on that question. Our view is that the defendants are not organs of the foreign state. Our view is also that you look at the type of activity that they're engaged in in the allegations of the case. But I wanted to get specifically at the level of sort of the legal substantive test. Do you think that there's a difference between the common law standard under 66G and the organ standard under FSIA? I don't think so, Your Honor. I think that the particulars of the FSIA are not present in the common law in terms of what requirements are needed to be met. But the bedrock test of whether the entity is engaged in sovereign functions versus non-sovereign functions I think is something we embrace in our briefing. The question is just here. There's no question that they're not engaged in sovereign functions. They're engaged in core commercial activity. How do you deal with the PowerX case? What part of the PowerX case, Your Honor? Because PowerX was found, despite the outward commercial nature of its activity, to be covered by the FSIA's definition. I think that in this case, I think that the district court correctly held that these defendants are not organs of the foreign state from the first instance. So they don't meet the definition. They are separate legal persons. They are not sufficiently tied to the state or the state's public functions. And that flows from this court's decision in Patrickson, cited in the government's brief at page 32. In addition to that, the allegations in the indictment are pure commercial activity. And whether you view that at the ex ante stage as part of the analysis as to whether there is common law immunity at all or whether you view it as an exception to immunity, I think the result is the same, which is a separate corporate entity that's engaged in commercial activity, as these entities are alleged to be engaged in, has not been granted immunity under the common law and particularly has not been granted immunity under the common law over the executive's objection. I'm sorry. No, go right ahead, Judge Woyla. So just to follow up on that, I mean, I think in PowerX the entity did perform government functions, and I think that's what the answer would be by panging group. And then they rely on the allegations, the initial allegations of the third superseding indictment that said, you know, this was a high priority for the People's Republic of China to develop this, and that that's why panging group was somehow charged with carrying out this priority and this initiative in obtaining the PIO2 material. What's your response to that? We think that that blurs the distinction between the purpose behind the type of activity that these defendants were engaged in and the nature of the defendants as entities. So you asked earlier, Your Honor, about tying that sovereign function to these defendants, and the indictment, the allegations in the indictment do not do that. Now, we will have to prove at trial that the defendants engaged in this, the acts that they're alleged to have engaged in, for the purpose of benefiting a foreign state or a foreign instrumentality. That is the motive that we will have to prove at trial. But that's not a part of the activity that's charged in the indictment in terms of the acts that were taken, and it's not alleged that that is why these defendants were formed as companies or what their core function was in order to achieve this sovereign purpose. Earlier, you mentioned in this line of questioning the common law. The question is, what is the content of that, and where are we drawing that from? Are we drawing that only from decisions of U.S. courts? Are we drawing them also from decisions of U.S. courts under the FSIA, even though that statute we now know doesn't apply to criminal cases? Are we also looking to international decisions? How do you want us to give meaning to what this test should look like? I think that the common law is drawn from the cases in this country, applying principles going back to the founding. I think that cases under the FSIA would be instructive to the extent they are talking about principles that were codified from the common law, not principles that were abrogated by the FSIA, like the definition of a foreign state and the expansive view that the FSIA took on that front. For example, the Supreme Court has said that the definition of commercial is the same under the FSIA as it was under the common law, and so those cases would be instructive on that point. But the content of the common law, I think, is, you know, two centuries, as Your Honor mentioned earlier, of cases, and those cases, I think, make four principle points that I would just quickly want to highlight. The first is the executive has had the authority to prosecute foreign officials, going back to the founding, as I mentioned, even though those defendants claim they were the state qua state, like these defendants. The second is the bedrock principle that separate corporate persons have been treated separately for immunity determinations from the sovereign. That also goes back to the founding, the Planers Bank case from Chief Justice Marshall cited in the government's brief. The third, I would say, is the sovereign versus non-sovereign functions. If you look at the case law on that, again, the common law on that that's developed over time, and the East India cases, to pick an example from British courts, show that when the East India Company was engaged in sovereign functions treaty-making, it was immune, engaged in commercial activity. It was not immune. It wasn't a test based on simply the nature of the East India Company as an entity. It was based on the type of activity in which it was engaged. How different is this analysis than what we already do for civil cases under the FSIA applying the commercial exception? Is it meaningfully different? The government's position is that the definition of commercial activity is the same, although I think that we would get a little bit more leeway in the common law because we wouldn't have to precisely locate where the acts are, unlike the statutory definition for the commercial activity exception in the FSIA. So I think that the definition of what qualifies as commercial would be the same, but we wouldn't have to meet one of the three prongs that are in the statutory framework for the FSIA. What's your response to his argument on Count 2 that because you didn't incorporate Paragraph 30, you don't have the commercial use incorporated into that count? That is an argument that the defendants have raised for the first time this afternoon. Since 2012 we've been litigating this case, so I have not heard that argument before. I suppose on the merits I would say I don't know why the incorporation of the 15 paragraphs, Paragraphs 1 through 15 being realleged, would be insufficient to show that commercial activity occurred and the overt acts for Count 2 incorporate Paragraphs 32 through 50. So I suppose I'm a little bit at a loss both on how the defendants are able to raise that argument for the first time this afternoon, but also on the merits of why that would be the case. Where are the additional paragraphs incorporated in Count 2? So Count 2, I'm at Excerpts of Record 125 in the overt acts section, Paragraph 54. Is that the page number again? So at Excerpts of Record 125, it incorporates Paragraphs 32 through 50 in the conspiracy count. I'm happy to answer any other questions the court has. I see I'm well over my time. Thank you, Your Honor. All right, we took you over your time, so let's put three minutes on for rebuttal. I have a number of things to say that may be helpful. With respect to Republic of Mexico v. Hoffman, the two points that the court made were, it is therefore not for the courts to deny an immunity, which the government has seen fit to allow, not our situation, or to allow an immunity on new grounds, which the government has not seen fit to recognize. It was not a question of, as counsel phrased it, of disagreeing with the government about immunity in a particular case. That's number one. Number two, I take very seriously the court's questions about where the State Department is. I would articulate it this way. The Tate letter was a very comprehensive, thoughtful survey of the law of the world with respect to the adoption of the restrictive theory of sovereign immunity. There is nothing like that in this case. With due respect to, I'll say, my friends, and it's my former office, this is a group of assistant U.S. attorneys who decided to indict a case for all we know. It wasn't well conceived. They've changed their mind about the instrumentality status multiple times. Service was a mess. There's no indication that there's a thought-out standard or process in this case that would justify deference. I would agree that if there were an analog to the Tate letter adopted by the State Department or what should have happened, which is Congress passing a statute directing a comprehensive scheme, which the courts have routinely said about the FSIA, we'd have an entirely different case. With respect to the subject of deference, you asked several times, what degree of deference? You didn't ask, but might have, about what? Or is it just that you are supposed to treat the government as if they're sitting there with Judge Jeffrey White and they get a vote or a partial vote about whether there's immunity and how much does their vote count? With all due respect to everybody, that's silly. The government might get deference or did get some deference from 52 to 76 about whether certain requisites of commercial activity or instrumentality had been developed sufficiently. It was a mess. It was bedlam, according to Justice Scalia, and led to the adoption of the FSIA. Ultimately, there was no real purpose and satisfaction from that deference, and there's certainly no occasion for deference here where the government can't even articulate about what or to what degree. With respect to paragraph, with respect to Count 2, Your Honor, you were directed to the 2012 indictment. We are here about the third superseding indictment, which is ER 99, Count 2, says the, I'm reading this, the allegations contained in paragraphs 1 through 15 are realleged and incorporated as if fully set forth herein. And the most important point there is that if you look at those paragraphs, in addition to not alleging any commercial activity, there's no indication of where commercial activity, if one were to have concluded it occurred, where that activity itself had occurred. I have one more comment if I may. I wanted to clarify because I was confused by this point because the copy of Count 2, the indictment, that I have and that I've been looking at is the third superseding, and I don't see any reference in Count 2 to incorporating anything other than 1 through 13. 15, Your Honor. 1 through 15. That's correct. And now I see, and it wasn't ER, it's actually SER 125 does incorporate more, but that's a different Count 2. It's a conspiracy count in the prior indictment. Correct. Am I reading that correct? You're 100% correct. And then I would say, depending on how much more time the courts would give, I would say this with respect to the subject of instrumentality. How should I put this politely? The trial lawyers who were before Judge White twice and in effect conceded on instrumentality the first time and then specifically with respect to Oregon the second time, and he's so found, and you had to write something about what to do when the government concedes something. Those trial lawyers know that there's going to be a mountain of what they, or they hope there will be, a mountain of evidence to establish that our clients are instrumentalities under the Economic Espionage Act. And while there may be some daylight between, I shouldn't say may, while there is some daylight between that definition, as Your Honor has correctly written, and the definition in the FSIA, which no longer matters that much, this is a, I hate to say it this way, but this is a sort of a theater. There's going to be tremendous, if the government has its way, tremendous evidence that our clients are instrumentalities of the Chinese government. So this issue should not be one the government resists at this stage. What we should do is defer to the people who are going to try this case, and instrumentality status was conceded below in the form of Oregon, and it should be, I say with all due respect, a no-brainer for this proceeding. All right. Thank you, Counsel. Thank you. Unless my colleagues have any further questions. All right. Thank you, Counsel. We thank both counsel for their helpful arguments in this case, and the case just argued will be submitted, and we stand in recess. Thank you, Your Honor. Have a nice weekend. All rise. Hear ye, hear ye. All persons having had business with the Honorable, the United States Court of Appeals for the Ninth Circuit, will now depart for this court for this session. Now stands adjourned.
judges: WARDLAW, COLLINS, BRESS